Ralph W. KEITH, et al., Plaintiffs,

v.

John A. VOLPE, as Secretary
of Transportation, et al.,
Defendants.

No. CV 72–355–HP.

United States District Court,
C.D. California.

April 10, 1997.

Robert L. McWhirk, Culver City, CA, for Century Housing Corp.

William G. Brennan, Sacramento, CA, for California Dept. of Transp.

Carlyle W. Hall, Jr., Hall & Associates, Los Angeles, CA, for Plaintiffs.

CORRECTED MEMORANDUM AND ORDER GRANTING DEFENDANT CENTURY HOUSING CORPORATION'S MOTION FOR MODIFICATION OF EXHIBITS B AND C OF THE AMENDED CONSENT DECREE AND DENYING PLAINTIFFS' MOTION FOR MODIFICATION OF EXHIBITS B AND C AND THE ADDITION OF EXHIBIT D TO THE AMENDED CONSENT DECREE

PREGERSON, District Judge.

This matter is before the court on Plaintiffs' and Defendant Century Housing Corporation's ("CHC") motions and cross-motions for modification of the amended Consent Decree ("Consent Decree").

## FACTS AND PRIOR PROCEEDINGS

I. *1972 to 1987: The Initial Proceeding and Consent Decree*

A. *Initial Proceeding*

Twenty-five years ago, on February 16, 1972, Plaintiffs brought this environmental protection suit against Federal and State Defendants in the United States District Court for the Central District of California to halt work on the proposed I–105 Freeway project "until governmental officials complied with the following: federal and state statutes enacted to protect the human environment; federal statutes enacted to protect homeowners, tenants, and businesses forced to relocate; and federal statutes enacted to ensure public participation in the decision making process through public hearings." *Keith v. Volpe,* 501 F.Supp. 403, 405 (C.D.Cal.1980). The path of the proposed freeway adversely affected housing stock in "predominantly low-income and minority communities." *Keith v. Volpe,* 643 F.Supp. 37, 39 (C.D.Cal. 1985).

To vindicate important national and state policies, this court issued an injunction to halt further work on the proposed Freeway project until state and federal officials completed the environmental impact studies and reports required by the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347, ("NEPA"), and the California Environmental Quality Act of 1970, Cal. Pub. Res.Code. §§ 21000–21151 ("CEPA"). In addition, this court's order required that governmental officials hold additional public hearings, conduct further housing availability studies, and give satisfactory assurances that adequate replacement housing would be available as required by the Federal–Aid Highway Act of 1968, 23 U.S.C. §§ 501–511, and the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §§ 4201–4655. The Environmental Impact Report and Environmental Impact Statement ("EIS") required by NEPA took five years to prepare, and was approved in 1978 by the Secretary of the United States Department of Transportation.

*Keith v. Volpe,* 501 F.Supp. 403, 405 (C.D.Cal.1980).

### B. *Consent Decree*

A year later, in October 1979, all parties agreed to settle the claims arising from the initial 1972 proceeding in a Final Consent Decree, later amended on September 22, 1981. The Consent Decree dissolved this court's 1972 injunction and required that the Freeway be constructed as proposed in the EIS. Among other goals, the Consent Decree required that the Freeway project be built with supporting transit facilities; that housing stock be replenished for communities affected by the proposed path of the freeway; that employment opportunities generated by the Freeway project benefit the communities economically impacted by the project; and that significant economic opportunities and technical assistance support be provided for women and minority business enterprises. *Consent Decree* at 3.

The Consent Decree incorporates Exhibit A, which details the construction requirements for the Century Freeway; Exhibit B, which describes the affordable housing program ("Housing Program"); and Exhibit C, which sets forth an employment and business plan of affirmative action for the benefit of the corridor communities, women, and minority group members.

### C. *Entities Created to Implement the Consent Decree*

The Consent Decree created the Century Freeway Housing Program ("CFHP") and designated the California Department of Housing and Community Development ("HCD") as the lead agency to coordinate and implement the Housing Program. *Exhibit B* at 1. In addition, the Consent Decree required the State of California to participate in and fund the Century Freeway Affirmative Action Committee ("CFAAC"), *Consent Decree, Exhibit C,* at 25–29, and the Office of the Advocate for Corridor Residents ("Corridor Advocate"), *Consent Decree* at 11.

CFAAC was responsible for monitoring compliance with Exhibit C, which embodies the affirmative action and equal opportunity requirements of the Consent Decree. Spe-

cifically, CFAAC was required to review and prepare written comments on the responsiveness of all bids and contracts to the requirements of the Decree; conduct periodic reviews of each contractor's performance; receive complaints; conduct on-site inspections and interviews; assist in the process of achieving equal employment opportunity and achieving participation by minority and women business enterprises; help locate and recruit employees, contractors, and subcontractors; and establish effective programs for contractors and subcontractors unable to meet women and minority business enterprise and equal employment opportunity goals. *Consent Decree, Exhibit C* at 26–28.

The Corridor Advocate was responsible for monitoring compliance with certain goals of Exhibit B, the Housing Program. Specifically, the Advocate was responsible for establishing a local office in the general area where the remaining displacees resided; monitoring State Defendants' compliance with all applicable state and federal regulations pertaining to the relocation rights of the displacees; reviewing and commenting on the draft texts of notices and information sheets to be provided to displacees and the strategy for notification of tenants of rental units of their eligibility for benefits; receiving and recording displacee complaints; providing information to displacees relevant to relocation benefits under applicable federal and state laws and regulations; and assisting displacees who had complaints or disputed claims with the California Department of Transportation ("Caltrans"). *Consent Decree* at 11–15.

### D. The *Housing Program*

When first established by the Consent Decree, the Housing Program consisted of three distinct segments:

#### 1. *The 1025 Segment*

This segment required the State of California, acting through HCD as the lead agency, to rehabilitate or construct through one of its entities, namely CFHP, 1,025 units of housing pursuant to approvals given by the Federal Highway Administration ("FHWA")

before August 25, 1981. *Consent Decree, Exhibit* B at 1–2.

### 2. *The 1175 Segment*

This segment required HCD, acting through CFHP, to construct or rehabilitate at least 1,175 units of housing to meet the housing needs of residents previously living on the Freeway right-of-way ("corridor residents") and who were eligible for benefits under the Uniform Relocation Act, 42 U.S.C. § 4201–4655. *Consent Decree, Exhibit B* at 2.

### 3. *The $110 Million Segment*

This segment required the FHWA to authorize the expenditure of $110 million in federal funds—augmented by a one-time inflationary increase—to be matched with state funds in the same proportion as the federal/state proportionate contributions for freeway construction. These funds were to be used to produce affordable housing units. *Stipulation and Order of Jan. 29, 1993 Re Use of Proceeds of Sales of Units from 1025 and 1175 Housing Segments* at 2–3.

The Consent Decree required that any proceeds from the sale of housing units constructed under the 1025 and 1175 segments be reimbursed to Federal and State Defendants. Proceeds generated by the sale of housing units constructed under the $110 Million Segment were to be used for construction of additional low and moderate income housing. *Id.*

### II. *1988 to 1994: The Restructured Housing Program and Completion of the Freeway*

This court's Order of April 14, 1988, directed that the $110 Million Segment be restructured to provide a more efficient approval process by reducing FHWA's role and by expediting procedures. The Order provided that: (1) any then-existing housing units which had been previously constructed under the $110 Million Segment be transferred to the 1025 and 1175 Segments (and counted toward meeting the requirements of these Segments as originally established); and (2) Federal and State Defendants fully fund the $110 Million Segment. *Order of April 14,*

*1988 to Amend Consent Decree and Implement Admin. Changes in Century Freeway Housing Program* at 2–3.

In February 1991, 214 units remained to be "contracted for" to complete the requirements of the 1025 and 1175 Segments of the Housing Program. *Order of Feb. 20, 1991 Modifying Amended Final Consent Decree [Expanded $110 Million Program]* at 2. This court's Order of February 20, 1991 directed that these 214 units be deleted from those Segments, and that $16.05 million be added to Defendants' obligation to fund the $110 Million Segment. Thereafter, the $110 Million Segment was to be known as the "Expanded $110 Million Segment." The Order also directed that the Defendants deposit the total amount of their obligation to fund the Expanded $110 Million Segment into a "Special Fund Account" in the California State Treasury to be held in trust to fund the Expanded Segment. The Order further provided that any funds received by the State from transactions involving the provision of housing under the Expanded $110 Million Segment be re-deposited into the Special Fund Account, effectively recycling the funds.

This court's Order of January 29, 1993 directed that all proceeds from the sale of housing units identified in Exhibit A, from transactions after July 1, 1993 and involving units constructed under the 1025 and 1175 Segments, and from transactions involving units constructed under the Expanded $110 Million Segment were to be deposited into the Special Fund Account in the California State Treasury. The Order also directed that all costs for CFHP were to be paid out of the same account. *Stipulation and Order of Jan. 29, 1993 Re Use of Proceeds of Sales of Units from 1025 and 1175 Housing Segments* at 4, 7.

The 1993 Order also required State Defendants to prepay all estimated program costs. In exchange, State Defendants were released from any future financial obligations after July 1, 1993. Federal Defendants were also released from any future financial obligations.

The Consent Decree, as first amended in 1981, required that approximately 3,700 units of affordable housing be built. As of 1995, CFHP had built, was constructing, or planned to construct approximately 5,700 affordable housing units. This performance well exceeds the Consent Decree's goal. *Stipulation and Order of July 31, 1995 Re Restructuring of the Century Freeway Housing Program ("Privatization Order")* at 3.

The Freeway opened on October 13, 1993, with high occupancy vehicle lanes and a light-rail line in the median as required by Exhibit A and subsequent court orders. Based on Caltrans's most recent figures, freeway construction is now close to completion at a total cost of $2.24 billion. (Def.'s Mem. P. & A. Supp. Mot. Amend Consent Decree at 2).

### III. *1995: Privatization*

CFHP, as structured before the 1995 Privatization Order, had the resources necessary to meet the housing production goals. All parties recognized, however, that continued administration of the housing program by state agencies was not the most efficient way to maximize the impact of the affordable housing funds. The parties also recognized that given the cost of state administration, the Housing Program "would not be able to allocate additional funds for affordable housing production, and funds allocated to monitor thirty-year affordability of housing units could be exhausted prior to the thirty-year term, thereby jeopardizing the housing benefits of the Consent Decree." *Privatization Order* at 3. To address these concerns, this court signed and filed a stipulated Privatization Order on July 31, 1995. The stipulation was signed by Carlyl W. Hall, Plaintiffs' Counsel, Leon W. Weidman, Counsel for Federal Defendants, and Ralph Livingstone, Counsel for State Defendants.

The goals of the Privatization Order were: (1) to "maximize the use of limited resources to achieve and exceed Consent Decree affordable housing production goals;" and (2) to "prolong the monitoring and enforcement of affordable housing regulatory agreements."

*Id.* at 4–5. To meet these goals, the Privatization Order transferred responsibility for administration of the Housing Program from HCD/CFHP to a newly-created private, non-profit organization to be incorporated in the State of California: Century Housing Corporation. The Privatization Order required the transfer and consolidation of all assets formerly in the Special Fund Account to CHC. *Id.* at 14–15. An interim administrator and trustee, Allan Kingston, was appointed to manage the Housing Program's assets and activities during the transition from the state agencies to the CHC.[1] *Id.* at 11. This court appointed a ten-member Board of Directors for CHC, selecting candidates from nominees suggested by all parties.

The Privatization Order relieved the Federal Defendant from its obligations under the Consent Decree and as a defendant in *Keith v. Volpe,* 501 F.Supp. 403 (C.D.Cal.1980). *Privatization Order* at 26. State Defendant's motion to dismiss, filed with this court on April 1, 1996, is still pending. *Id.* Under the Privatization Order, this court may retain jurisdiction over the case for up to five years. *Id.* at 24. Plaintiffs' Counsel was to hold the same relationship with CHC as it had to HCD/CFHP. *Id.*

### IV. *1996 to Present: Modifications to the Consent Decree*

#### A. The *Lopez/Montoya Report*

The Privatization Order anticipated further modifications to the Consent Decree and its Exhibits:

> Subsequent to this Order, the Administrator and the Parties shall begin review of the Consent Decree, Court orders thereunder, and state and federal laws to determine what modifications may be desirable for the Corporation [CHC] to achieve Exhibit B and C goals in an efficient and equitable manner, and to recommend how Housing Program procedures and functions should be revised to reflect privatization of the Housing Program. The Administrator shall retain a consultant under

---

1. Kingston now serves as CHC's President and Chief Executive Officer, and is a member of the CHC Board of Directors.

terms substantially similar to those contained in the March 24, 1995 order of this [c]ourt, and consult with the support entities [such as CFAAC, the Corridor Advocate, etc.] to assist in such review. Any modifications to such goals and/or the Consent Decree or orders issued thereunder shall be effective only pursuant to subsequent order of this [c]ourt, and, as to modifications of the Consent Decree, with the concurrence of the Parties.

*Privatization Order,* ¶ 2.1.2 at 17.

In September 1995, CHC Administrator Allan Kingston retained consultants Daniel Lopez[2] and Joseph Montoya[3] to prepare a report recommending revisions to Exhibits B and C of the Consent Decree. In preparing this report, Lopez and Montoya consulted with all parties to the Consent Decree, all administrative bodies involved in implementing the Consent Decree, and Plaintiffs' Counsel. The March 19, 1996 report (the "Lopez/Montoya Report") was submitted to CHC's Board and this court on March 20, 1996.

The Lopez/Montoya Report proposed modifications to Exhibits B and C that were considered by CHC, pursuant to this court's March 26, 1996 Minute Order. CHC's Board adopted a Statement of Principles and a Mission Statement and submitted comments on the Lopez/Montoya Report to this court on April 12, 1996. (Pls.' Exh. 21; CHC Resp. Consultants' Rept. Proposed Rev. Exh. B & C Consent Decree.) In almost all respects CHC's Board adopted the consultants' rec-

ommendations as presented in the Lopez/Montoya Report.[4]

In court-sponsored conferences, all parties again reviewed the Lopez/Montoya Report during the week of April 20, 1996. On April 24, 1996, this court directed the parties to discuss the Lopez/Montoya Report's proposed revisions to the Consent Decree, to agree where possible, and to submit all unresolved issues to the court for decision. The parties failed to agree on any of the proposed modifications to the Consent Decree and arrived at an impasse. CHC then proceeded to endorse substantially all of the Lopez/Montoya Report's proposed changes and to draft a business plan.

On May 10, 1996, CHC staff presented a draft business plan to CHC's Board for approval. This draft business plan incorporated the goals set forth in the Lopez/Montoya Report. CHC's Board tentatively approved this plan at a June 18, 1996 meeting, subject to adoption and approval of specific implementation plans for each new loan product. On July 12, 1996, implementation plans were submitted to the New Business Committee of CHC's Board of Directors for further discussion. On July 25, 1996, Plaintiffs' Counsel was given the opportunity to explain his views to CHC's Board. In a report to this court dated August 2, 1996, Plaintiffs' Counsel acknowledged the many opportunities afforded him to consult with CHC about the business plan but asserted that he had a "legitimate concern for developing a process and structure to ensure that our clients receive the anticipated Consent Decree bene-

---

**2.** Daniel Lopez became a CHC Board Member after the report was completed. Lopez is an independent consultant in affordable housing finance and development. He has previously served as President and Chief Executive Officer of the California Community Reinvestment Corporation, as Director of Community Lending for Citibank, and as Chief of Housing for the Association of Bay Area Governments.

**3.** Now retired, Joseph Montoya was formerly the Chief Counsel of Caltrans. In the late 1960's, Montoya served as a consultant to the Caltrans engineers designing the Century Freeway. He then served as the lead attorney for the State Defendants in the original *Keith v. Volpe,* 501 F.Supp. 403 (C.D.Cal.1980) action, and as the chief State negotiator on the Consent Decree.

**4.** Lopez and Montoya recommended that CHC's housing development efforts be expanded to include the "tertiary zone." The Consent Decree envisioned primary, secondary, and tertiary development zones for affordable housing, extending six, twelve, and eighteen miles respectively from the Freeway. *Consent Decree, Exh. B* Part III.B. at 11. Prior to the Lopez/Montoya Report, CHC and its predecessor CFHP had limited their development efforts to the primary and secondary zones.

CHC's Board of Directors recommended that the area served by the Housing Program be defined as the "greater Los Angeles metropolitan area, including, but not limited to, Los Angeles and Orange counties." *Id.* at 3. This area would go beyond the primary, secondary, and tertiary zones of the Consent Decree.

fits." (Pls.' Exh. 28; Pls.' Rept. Status Implementation Amended Fin. Consent Decree at 4.)

### B. Modification Negotiations

The parties unsuccessfully attempted to discuss and agree on proposed modifications to Exhibits B and C when they met on June 23, 1996 and September 18, 1996. CHC submitted its proposed revisions to Exhibits B and C to this court on September 24, 1996. These proposed revisions closely paralleled the Lopez/Montoya Report's recommendations.

By Minute Order filed December 23, 1996, this court ordered the parties to meet again to discuss the proposed modifications to Exhibits B and C. The parties agreed to meet face-to-face on January 17, January 22 and January 28, 1997. After meeting on January 17 and 22, the parties agreed that despite their good-faith efforts, fundamental differences prevented concurrence on the modifications. They therefore cancelled the January 28,,1997 meeting.

This court accordingly issued a Minute Order on January 23, 1997, requesting that the parties file motions with supporting documents on January 31, 1997 and that counsel meet with Special court Coordinator Dick Johnson for further settlement discussions on February 11, 1997. In response to this Order both parties filed motions, countermotions, oppositions and replies along with hundreds of pages of supporting declarations and affidavits. In these filings, both parties acknowledged that they were at an impasse. (Def.'s Hem. P. & A. Supp. & Proposed Order, filed January 31, 1997 at 4; Pls.' Hem. P. & A. Supp. Mot. Amend Consent Decree at 3.)

### C. Summary of Parties' Proposals

#### 1. CHC's Proposed Modifications

CHC has moved this court to adopt the following modifications to Exhibits B and C of the Consent Decree:

1) The geographic area affected by the Consent Decree's Housing Program would be altered to include the "Los Angeles metropolitan area, including the tertiary zone," (Def.'s Hem. P. & A. Supp. Mot. Amend Exhs. B & C Consent Decree at 7–8);

2) The underwriting criteria would be general, rather than fixed, to reflect the ever-changing real estate market and the affordable housing industry, id. at 9;

3) Distribution by income band would be recognized as a goal, rather than a strict requirement, id.;

4) The rental affordability mechanism would be updated in order to finance and sell housing developments, id. at 10;

5) CHC would be given the authority to acquire and/or rehabilitate existing housing, id. at 12;

6) Caltrans would be relieved of all obligations with respect to the Housing Program, id.;

7) CHC would assume CFAAC's and the Office of the Advocate's functions. Id. at 13.

#### 2. Plaintiffs' Counsel's Proposed Modifications

Plaintiffs' Counsel has moved this court to adopt the following modifications to the Consent Decree:

1) The addition of a new "Exhibit D." This Exhibit would provide for the appointment of an Office of the Ombudsman to assume the responsibilities of CFAAC, Office of Resident Services, and Century Office of Affordability Monitoring, (Pls.' Hem. P. & A. Supp. Mot. Amend Consent Decree at 10);

2) The wording of Exhibits B and C would be modified to reflect the change in management structure from the state agencies (HCD/CFHP) to CHC, a non-profit corporation. Id. at 9.

### D. The February 13, 1997 Hearing

At the February 13, 1997 hearing, this court heard an entire day of extensive argument from both parties.[5] In addition to ar-

---

**5.** Plaintiffs' Counsel stated that "modifications to a consent decree are normally appropriate only after an evidentiary hearing has been held, at which hearing appropriate evidence can be mar-

gument from Counsel for the Plaintiffs and CHC, the court also heard from William G. Brennan, General Counsel and Deputy Secretary of the Department of Business, Transportation and Housing of the State of California, various CHC Board members, and from representatives of the affordable housing industry in Southern California.

## ANALYSIS

### I. *The Court's Power to Modify the Consent Decree*

#### A. The *Swift Standard for Modification of Consent Decrees*

Before this court can consider the modifications urged by the parties, it must first resolve the threshold question whether it has the authority to modify the consent decree without the concurrence of both parties.

This initial question is complicated by language in the Privatization Order relating to future modifications:

> Any modifications to such goals and/or the Consent Decree or orders issued thereunder shall be effective only pursuant to subsequent order of this Court, and, as to modifications of the Consent Decree, with the concurrence of the Parties.

*Privatization Order* at 17–18.

The Consent Decree itself, however, recognized the inherent power of the court to modify the Decree:

> Upon noticed motion and opportunity to any party to object, this Amended Decree may be modified or amended if plaintiffs' counsel and State and Federal defendants to this litigation agree in writing with the approval of this court. As part of its inherent power, the court may modify this Amended Decree upon motion by either

plaintiffs or Federal defendants or State defendants.

*Consent Decree* Part VI at 15.

The parties both appear to argue that this court has the power to modify the consent decree without the concurrence of both parties. When CHC's Counsel was asked if the court had the power to modify the consent decree and adopt all of *Plaintiffs' Counsel's* proposed changes, over CHC's objections, he answered:

> Yes, your Honor. We feel that in the instance where a substantive modification is being made where a procedural element might be lacking is completely different from this case where both *sides have requested substantive modifications.*

(R.T. at 47) (emphasis added).

On this subject, Plaintiffs' Counsel said:

> [The "with the concurrence of the parties" language] can only mean that modifications of the Consent Decree could be ordered with the concurrence of the parties but not without the concurrence of the parties *unless—and of course we concede this—the court in its inherent power, which is also recognized in the Consent Decree—has grounds to modify the Consent Decree.*

(R.T. at 125) (emphasis added).

Courts have wrestled with the question of what grounds are sufficient to modify a consent decree. In his moving papers Plaintiffs' Counsel directs this court to the decision of the United States Supreme Court in *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). In *Swift,* the nation's five leading meat packers stipulated to a consent decree limiting their commercial activities, in order to avoid anti-trust litigation. *Id.* at 111, 52 S.Ct. at 461. Ten years later these companies petitioned for modification of the order to reflect changed market conditions. *Id.* at 113, 52 S.Ct. at 461–62. The Supreme Court reversed the modification granted by the district court, and explained: "Nothing less than a clear showing

shaled by both sides." (Pls.' Mem. P. & A. Supp. Mot. Amend Consent Decree at 8.) Given the court's familiarity with the present case, however, a full evidentiary hearing was unnecessary. *See United States v. Oregon,* 913 F.2d 576, 582 (9th Cir.1990), *cert. denied,* 501 U.S. 1250, 111

S.Ct. 2889, 115 L.Ed.2d 1054 (1991) (adopting the "growing rule.. that the trial court may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision.")

of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." *Id.* at 119, 52 S.Ct. at 464.

*Swift's* demanding standard for modification of consent decrees proved unduly restrictive as decrees became more complex, of longer duration, and more frequently employed in public interest litigation. The Second Circuit distinguished *Swift* and emphasized the unique requirements of *institutional reform* litigation:

> It is well recognized that in institutional reform litigation such as this[,] judicially-imposed remedies must be open to adaptation when unforeseen obstacles present themselves, to improvement when a better understanding of the problem emerges, and to accommodate a wider constellation of interests than is represented in the adversarial setting of the courtroom.
>
> .    .    .    .    .
>
> As experience with this type of litigation increases, a consensus is emerging among commentators in favor of modification with a rather free hand.

*New York State Assoc. for Retarded Children v. Carey,* 706 F.2d 956, 969–70 (2d Cir.1983).

Similarly, in a case involving the same consent decree now at issue, the Ninth Circuit recognized that "courts have not applied the strict *Swift* standard to modifications that alter the parties' obligations when experience with a consent decree reveals problems with its administration." *Keith v. Volpe,* 784 F.2d 1457, 1460 (9th Cir.1986).

### B. *The Rufo Standard for Modification of Consent Decrees*

■ In *Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the United States Supreme Court revisited the issue of modification of consent decrees in the context of institutional reform litigation. The Court first held that a consent decree is subject to Federal Rule of Civil Procedure 60(b). *Id.* at 378, 112 S.Ct. at 757. This Rule provides in part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

Fed.R.Civ.P. 60(b).

Accordingly, this court's authority to modify a consent decree is grounded in Rule 60(b).

The Supreme Court in *Rufo* went on to explain that Rule 60(b) had not "codified the grievous wrong' standard of ... *Swift*." *Id.* at 378–79, 112 S.Ct. at 757. Rather, by allowing modification on "terms as are just," *id.* at 380, 112 S.Ct. at 758, Rule 60(b) "permits a less stringent, more flexible standard." *Id.* The Court explained that "a flexible approach is often essential to achieving the goals of reform litigation." *Id.* at 381, 112 S.Ct. at 758.

Modification of a consent decree under *Rufo* requires a two-step analysis: first, the moving party must meet the initial burden of showing change warranting the modification, and second, the proposed modification must be suitably tailored to the changed circumstances.

■ Because Rule 60(b)(5) allows for relief when prospective application of a judgment is no longer equitable, "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id.* at 383, 112 S.Ct. at 760. A moving party can meet this initial burden "by showing a significant change either in factual conditions or in law." *Id.* at 384, 112 S.Ct. at 760.

The present case involves changed factual conditions. The Supreme Court in *Rufo* described three settings where a change in factual conditions allow for modification of a consent decree:

Modification of a consent decree may be warranted when changed factual conditions make such compliance with the decree substantially more onerous.... Modification is also appropriate when a decree proves to be unworkable because of unforeseen obstacles ... or when enforcement of the decree without modification would be detrimental to the public interest.

*Id.*

■ The district court's role does not end when the moving party has met its initial burden and shown that a change of fact warrants modification of a consent decree. Once the moving party has met this burden, the court "should determine whether the proposed modification is suitably tailored to the changed circumstance." *Id.* at 391, 112 S.Ct. at 763. There are three concerns which guide this evaluation.

First, "a modification must not create or perpetuate a constitutional violation." *Id.* Next, "[a] proposed modification should not strive to rewrite a consent decree so that it [does no more than] conform[ ] to the constitutional floor." *Id.* Finally, the district court should "defer to local government administrators, who have the primary responsibility for elucidating, assessing, and solving the problems of institutional reform, to resolve the intricacies of implementing a decree modification." *Id.* at 392, 112 S.Ct. at 764 (internal quotations and citations omitted).

Federal courts have relied on *Rufo's* flexible standard to modify consent decrees when changing factual circumstances or changing laws have made the decrees detrimental to the public interest. In *Hook v. Arizona,* 98 F.3d 1177 (9th Cir.1996), the Ninth Circuit modified a consent decree which allowed holiday gift-packages for Arizona state prisoners, when an explosive growth of prisoners and a dramatic increase in prisoners' drug use made searching the packages an "excessive burden" on state prison authorities which "proved to be detrimental to the public interest." *Id.* at 1180. Other circuits have applied the *Rufo* standard to proposed modifications of consent decrees which implement race-based affirmative action plans, *Branch v. Seibels,* 31 F.3d 1548 (11th Cir.1994), decrees which regulate prison conditions, *Alberti v. Klevenhagen,* 46 F.3d 1347 (5th Cir. 1995), and decrees relating to trade restraints. *In re Detroit Auto Dealers Ass'n, Inc.*, 84 F.3d 787 (6th Cir.1996).

The present case is sufficiently analogous to an "institutional reform" case to be controlled by the *Rufo* standard.[6] A "particularly significant" rationale underlying the flexible *Rufo* standard for institutional reform consent decrees is that "such decrees reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions." *Rufo,* 502 U.S. at 381, 112 S.Ct. at 759 (internal quotations omitted). Similarly,

---

**6.** Plaintiffs' Counsel urges this court to abandon *Rufo* and its progeny, arguing that the present case is not an "institutional reform" case and the proposed modifications are therefore controlled by the more demanding *Swift* standard. It is by no means a settled issue, however, whether the *Swift* standard survived *Rufo* and still applies in noninstitutional reform cases. In *United States v. Western Electric Company,* 46 F.3d 1198 (D.C.Cir.1995), the D.C. Circuit noted that two courts of appeals "have treated *Rufo* as a decision limited to institutional reform litigation." *Id.* at 1203 (citing *Lorain NAACP v. Lorain Bd. of Educ.,* 979 F.2d 1141, 1148 (6th Cir.1992) (en banc), *cert. denied,* 509 U.S. 905, 113 S.Ct. 2998, 125 L.Ed.2d 691 (1993); *W.L. Gore and Assoc's, Inc. v. C.R. Bard, Inc.,* 977 F.2d 558, 562 (Fed. Cir.1992)). By contrast, in *Western Electric Company* the D.C. Circuit joined two other courts of appeals and concluded that "Rufo gave the 'coup de grace' to Swift and the Supreme Court's summary of what might render a modification 'equitable' relates to all types of injunctive relief." *Western Elec. Co.,* 46 F.3d at 1203 (citing *In re Hendrix,* 986 F.2d 195, 198 (7th Cir.1993); *see also Patterson v. Newspaper and Mail Deliverers' Union of New York,* 13 F.3d 33, 37–38 (2d Cir.1993), *cert. denied,* 513 U.S. 809, 115 S.Ct. 58, 130 L.Ed.2d 16 (1994)). After *Western Electric Company* the Third Circuit concluded that *Rufo could* apply outside of the institutional reform context: "[T]he standard for modifying an injunction cannot depend on whether the case is characterized as an institutional reform case, a commercial dispute, or private or public litigation." *Building and Const. Trades Council of Philadelphia, AFL–CIO v. N.L.R.B.,* 64 F.3d 880, 888 (3d Cir.1995). Similarly, the First Circuit "[does] not read *Rufo* as being confined in principle to [institutional reform] cases." *Alexis Lichine & Cie v. Sacha A. Lichine Estate Selections, Ltd.,* 45 F.3d 582, 586 (1st Cir.1995). Accordingly, even if the present dispute were not an institutional reform case, the weight of circuit authority favors application of *Rufo* outside of the institutional reform context.

in the present case there is much more at stake than the interests of the parties. The creation of affordable housing is of tremendous importance to the citizens and communities of Southern California. Moreover, although CHC is a non-profit corporation, its funds originated from state and federal resources, and its duties and responsibilities most closely resemble those of a public institution. In institutional reform cases, "decrees often remain in place for extended periods of time, [and] the likelihood of significant changes occurring during the life of the decree is increased." *Id.* at 380, 112 S.Ct. at 758. In the present case, the same court has retained jurisdiction over the case for twenty-five years, and has overseen numerous changes during the life of the decree. Finally, as is true with consent decrees in many other institutional reform cases, the government—here, the State of California—remains a party to the original consent decree.

Because the present case is closely analogous to institutional reform cases, the *Rufo* standard controls the modification of the consent decree. Applying the *Rufo* standard, the Ninth Circuit recently explained, "[w]hen determining whether modification of a consent decree is appropriate, the district court should exercise flexibility." *Hook,* 98 F.3d at 1179 (citing *Rufo,* 502 U.S. at 383, 112 S.Ct. at 759–60). Accordingly, this court approaches the parties' requests for modification with flexibility in mind.

II. *Defendant CHC has Met its Initial Burden of Demonstrating Significant Change of Fact Warranting Modification, and the Proposed Modifications are Suitably Tailored to the Changed Circumstances*

Under *Rufo,* a party seeking modification of the consent decree "has the burden to demonstrate that a 'significant change' in fact ... warrants the modification." *Hook,* 98 F.3d at 1179. CHC has met this burden for each of its proposed modifications. In addition, CHC's proposed modifications are "suitably tailored to the changed circumstance[s]," *Rufo,* 502 U.S. at 391, 112 S.Ct. at 763.

Before discussing these proposed modifications in detail, a brief survey of the context and goals of the Consent Decree and Privatization Order is warranted. The Privatization Order of 1995 created a new and innovative organization in CHC: a non-profit corporation with much of the experience of a state agency, yet with the flexibility and low administrative costs of a non-governmental organization. CHC was created "in order to maximize available resources so that Consent Decree affordable housing production goals can be met *and exceeded." Privatization Order* at ¶ H (emphasis added). Privatization took place "in recognition of the need to preserve and protect the benefits of the Housing Program *for future generations." Id.* at ¶ 1 (emphasis added). To achieve these ambitious goals, the Privatization Order sought Board members with broad areas of expertise, including "[u]rban development and/or planning; ... [b]anking and/or financing of affordable housing, with knowledge of community lending and credit quality procedures; ... [t]he needs of corridor communities [p]roduction and legal aspects of real estate development [g]overnment programs and funding sources ...; and [a]ffordable housing production and rehabilitation." *Id.* at ¶ 1.1.2a-e. The Board members ultimately selected by this court reflect each of these broad areas of expertise, and represent an impressive stock of talent and experience intended to do far more than spend-down affordable housing funds as quickly as possible.

The Privatization Order also recognized that the Consent Decree, amended fourteen years earlier and intended to regulate state agencies, was inappropriate for the new CHC. The Privatization Order directed that the CHC Administrator and the parties:

> [S]hall begin review of the Consent Decree, [c]ourt orders thereunder, and state and federal laws to determine what modifications may be desirable for the Corporation to achieve Exhibit B and C goals in an efficient and equitable manner, and to recommend how Housing Program procedures and functions should be revised to

reflect privatization of the Housing Program.

*Id.* at 2.1.2 (emphasis added).

Thus, the Privatization Order was predicated on the premise that the Consent Decree needed to be modified. Moreover, the Order anticipated that such modifications would be immediate; "[s]ubsequent to th[e] Order," *id.,* and while the Administrator was still overseeing the transition of the Housing Program from the state agencies to the newly-created CHC. To help expedite the review of the Consent Decree and to solicit possible modifications, the Privatization Order directed that the Administrator "*shall* retain a consultant." *Id.* (emphasis added) The Privatization Order certainly did not contemplate that nearly two years would pass, that the parties would be at impasse and unable to agree on a single modification, and that the entire affordable housing program would grind to a halt.

Therefore, in addition the Ninth Circuit's admonition in *Hook* that the court should exercise flexibility when considering modifications of a consent decree, 98 F.3d at 1179, the court is also mindful of two goals underlying the 1995 Privatization Order. First, the Order created a non-profit corporation which was intended to provide affordable housing for many years to come. Second, the Privatization Order recognized that the old Consent Decree needed to be modified to serve this new organization, and the Order anticipated immediate modifications.

Finally, this court is thoroughly familiar with the concerns of the parties, has been closely involved with the construction of the Freeway, creation and monitoring of the Housing Program, and roles of the support agencies, and brings this experience to bear when evaluating the proposed modifications to the Consent Decree.

### A. *CHC's Proposed Modifications to Exhibit B*

#### 1. *Expansion of the Geographic Area*

■ The Consent Decree envisioned primary, secondary, and tertiary development zones for affordable housing, extending six, twelve, and eighteen miles respectively from the Freeway. *Consent Decree,* Exh. B Part III.B. at 11. The primary zone of operation was expanded to the secondary zone pursuant to this court's Order of June 23, 1988. CHC proposes modification of Exhibit B to permit the "production of affordable housing located in the Los Angeles metropolitan area, including but not limited to, Los Angeles and Orange Counties, as determined· by Century's Board of Directors." (Def.'s Proposed Exh. B at Sec. III, "Area Served.")

The sixteen years that have passed since the Consent Decree was last amended have seen enormous change in the demographics and needs of the corridor communities. As the Lopez/Montoya Report explained, "[a]t this time ... all known [Freeway] displacees have been served ..." (*Lopez/Montoya Report* at 4.) Michael J. Wright—former urban planner with the County of San Diego, participant in the Century Freeway Housing Program since 1980, and current CHC Vice President for Business Development and Marketing—stated that in the many years since the original consent decree, "the character of the communities affected by the Freeway has changed." (Def.'s Exh. E; Wright Decl. at 5 ¶ 21.) Wright explained that, for example, the 1990 Census demonstrated that the racial characteristics of many of the corridor communities have changed due to substantial migration. *Id.*

In addition to demographic movement, other changes have shook the area since the original Consent Decree. Wright notes that:

> [The City of Los Angeles] has often decried the fact that Century could not bring its resources to bear outside the secondary zone, most recently in the aftermath of the Northridge earthquake ... Despite considerable pressure for Century to play an important role in the earthquake recovery housing effort, Century was precluded from providing affordable housing to earthquake victims outside the secondary zone.

*Id.* at ¶ 22.

This court has also witnessed the negative impact of focused development in a restricted geographic area. Robert J. Norris, Jr.—Deputy Executive Director of the Housing

Development Division of the San Diego Housing Commission, former Associate Director of CFHP, former member of the CFAAC Board of Directors, CHC's current Executive Vice–President, and member of the CHC Board—stated that "one of the key lessons of the former Century Housing Program has been that you cannot just throw money at the problem." (Def.'s Exh. K; Norris Decl. at 2 ¶ 2.) Norris described the "inflated costs of property as a consequence of limiting development focus to just the primary and secondary zones," *id.*, as one of the reasons justifying privatization of the Housing Program. The Housing Plan "recognized that focusing in a regular manner on such a limited geography would have adverse effects on land prices in general, and specifically on affordable housing developments." (Def.'s Exh. E; Wright Decl. at 5 ¶ 20.)

Declarations submitted by Plaintiffs' Counsel fail to counter CHC's showing that there have been significant changes warranting expansion of the geographic area. Jennifer Bigelow—affordable housing and community development consultant and founding Executive Director of the Southern California Association of Non–Profit Housing (SCANPH)—states that "[i]t is hard to imagine that a 600 square mile zone [the secondary zone] ... does not contain sufficient under-developed, under-utilized or inappropriately developed sites for affordable housing." (Bigelow Decl. at 13–14 ¶ 38.) Bigelow identifies no such sites, however, and does not counter CHC's arguments that there has been tremendous demographic change in the corridor area.

Bigelow also focuses on the "nexus" between public tax dollars and the Consent Decree's development zones. *Id.* at 14 ¶ 41. The State—represented by William G. Brennan, General Counsel and Deputy Secretary of the Department of Business, Transportation and Housing of the State of California—disputes this characterization of the Housing Program funds as public tax dollars. (Def.'s Exh. D.; Brennan Decl. at 2 ¶ 3.) Brennan states that:

> All of the parties to the stipulated Privatization Order accepted the premise that the Housing Program funds and assets, once paid in settlement of *Keith v. Volpe* under the Consent Decree, were no longer public funds, that all such assets were then held by the State in nominal title only, and that transfer of funds and property held by the State nominally would not constitute a gift of public funds. For plaintiffs' counsel to describe Century's assets now as "taxpayer funds" or ["]taxpayer-generated funds" is wholly misleading....

*Id.*

Moreover, Bigelow's "nexus" argument ignores the fact that the initial zones were created to constrain and compel actions of a *state* agency sixteen years ago. The zones do not reflect the changed realities of the affordable housing needs now challenging the Los Angeles metropolitan area, and restrict the capacities of CHC to the "detriment[ ][of] the public interest." *Rufo*, 502 U.S. at 384, 112 S.Ct. at 760.

This court is inclined to agree with CHC that "[r]estricting the Housing Program to the secondary zone will continue to marginalize it, limit its effectiveness, and prevent it from becoming a responsive, regional force in the affordable housing community of Southern California." (Def.'s Exh. E; Wright Decl. at 6 ¶ 23.) CHC has met its burden of showing changed circumstances warranting modification of Exhibit B, and the proposed expansion of the geographic zone is "suitably tailored to the changed circumstances." *Rufo*, 502 U.S. at 391, 112 S.Ct. at 763.

### 2. Changes in underwriting criteria

■ The most hotly-debated proposed modification revolves around the issue of "soft seconds" or "deep gap funding." This type of funding essentially seeks to "subsidize the gap between the ... full cost of the housing and the revenue stream." (R.T. at 180:17.) CHC's proposed modification would allow it to use underwriting criteria "in a manner consistent with other affordable housing sponsors and lenders, secondary markets and government programs and agencies used in partnership with Century." (Def.'s Proposed Exh. B Part IV at 3.)

· Deep gap funding is important because it allows for the development of projects for

very very low income residents, such as the homeless, patients with AIDS, and the disabled. Such funding presents greater risks, however, and generates low returns for CHC over a long period of time. CHC has budgeted for some deep gap funding of projects, and intends to consider such projects in the future on an individual basis. CHC's business plan also anticipates a financing strategy that includes permanent loans in senior positions, supported by the income stream of the development. Plaintiffs' Counsel would prefer CHC to devote most or all of its lending efforts to deep gap funding, and at the February 13th hearing argued for a minimum of $25 million in such funding. (R.T. at 178–79.)

The crux of the "deep gap" debate is the repercussions of such funding for CHC's continued effectiveness, and, ultimately, fundamental differences in the parties' views of the role of CHC and its Board. Plaintiffs' Counsel believes Century's money "was supposed to be spent promptly and expeditiously and turned into affordable housing through deep gap subsidy." (R.T. at 170:17–24.) With CHC's budget quickly diverted to deep gap funding, the role of the Board would be to avoid the "administrative expense" of the state agencies and to provide "fees for services and to raise additional moneys." *Id.* at 171–72.

The views of CHC and State Defendant on the role of Century Housing stand in stark contrast to those of Plaintiffs' Counsel. Deputy Secretary Brennan well described the perception of CHC when the Privatization Order was signed in 1995 (a perception in which this court shared):

> [W]e all took great pride and excitement in the concept that we had devised a mechanism, a structure that had the opportunity to continue to provide affordable housing to need[y] people in the Los Angeles Basin area for *years and years and years* potentially to come. And that was a focus that we all had at that time, one that was subscribed by all parties and generated great excitement among everyone.

(R.T. at 109–10.)

Immediate diversion of all available funds to deep gap subsidies is obviously incompatible with the long-term effectiveness of CHC. As Kenneth D. Reed—former Vice President of Major Lending at Union Federal Bank and Century's Senior Vice President of Operations—stated: "Century's Business Plan is premised on Century being *an on-going concern.* In order to be an on-going concern, income must at least equal the cost of operation." (Def.'s Exh. F.; Reed Aff. at 2 ¶ 6) (emphasis added).

This court begins its analysis by examining the heart of the "deep gap" debate: the role of CHC. As suggested above, this court believes that CHC was created to maximize affordable housing resources and serve the Los Angeles community for many years to come. The Privatization Order demonstrates that all parties shared this view in 1995; CHC was created to "maximize available resources so that Consent Decree affordable housing production goals can be met *and exceeded.*" *Privatization Order* at 4 ¶ H. The Privatization Order was issued "in recognition of the need to preserve and protect the benefits of the Housing Program *for future generations.*" *Id.* at 5 ¶ 1 (emphasis added).

The parties must have envisioned CHC as a long-term non-profit organization seeking new and creative funding products when they stipulated in the Privatization Order to the expertise requirements of the Board members. The Board was to include experts in urban development, banking and financing, and production and legal aspects of real estate development. *Id.* at 7 ¶ 1.1.2a–e. The current CHC Board consists of individuals with an incredible range of talent and experience; much more than necessary to simply wind-down a Housing Program. As CHC's Board correctly responded when presented with Plaintiffs' Counsel's view of CHC's limited role in dispersing deep gap loans, "this was nonsense; no corporation would be needed for that and a small group of three people could take care of it." (Def.'s Exh. C; Lopez and Montoya Decl.'s at 2 ¶ 7.)

Plaintiffs' Counsel argues that, once CHC has dispersed its funds in deep gap loans, "the board could ... raise money on its own." (R.T. at 147:17.) This view flies in

the face of the actual composition of CHC's Board, which was created within the Privatization Order's parameters. There are no fundraisers on CHC's Board, and the Privatization Order did not require that this area of expertise be represented. *See Privatization Order* at 7 ¶ 1.1.2a-f.

Thus, a quick spend-down of CHC's funds through deep gap funding is inconsistent with the Privatization Order's—and this court's—view of the role of CHC in providing affordable housing for future generations. Accordingly, the court must determine whether significant factual changes warrant modification of the Consent Decree and allow CHC to pursue other loan products.[7]

The Lopez/Montoya Report found that the underwriting criteria throughout Exhibit B are "restrictive, outdated, and irrelevant to the continuing effort to provide additional affordable housing, given the opportunities to leverage and recycle funds." (*Lopez/Montoya Report* at 4 ¶ 2.) Robert L. McWhirk— attorney of record for CHC—stated that since the underwriting criteria in Exhibit B were adopted, government subsidy programs such as Section Eight have become much less available. (Def.'s Exh. A; McWhirk Decl. at 6 ¶ 15.) The process by which affordable housing developments are underwritten with low-income tax credits have also changed. *Id.* Finally, the role of the secondary loan markets—Fannie Mae and Freddie Mac— have also evolved considerably in the sixteen years since Exhibit B was adopted. *Id.*

The court also notes that CHC has never stated that it plans to eliminate deep gap funding. (Def.'s Exh. E; Reed Aff. at 3 ¶ 12) ("No one has posited that there is no longer a need for "subsidy-gap" financing . . .;") *see also* (R.T. at 189–90) (statement of Paul Zimmerman, Executive Director of West Hollywood Community Housing Corporation: "I was actually fairly heartened this morning to

hear the amount of [deep gap] flexibility that. the board is talking about building into the program. . . .") Plaintiffs' Counsel recognizes that a half-million dollars is currently designated for deep gap subsidies in the Lynwood project. (R.T. at 173.)

Significant changes in the nature of the administrating organization from state agency to private non-profit corporation, in the availability of government funding, and in the nature of the secondary loan markets support CHC's proposed modifications, and these modifications are suitably tailored to the changed circumstances.

### 3. *Income Bands*

■ CHC proposes that Exhibit B of the Consent Decree be modified to treat the income bands as a goal, rather than a strict requirement. There are several changed factual circumstances that support this modification.

The first is the change of administration of the Housing Program from a state agency to a non-profit corporation. As a non-profit, CHC is subject to IRS regulations which did not apply to the prior state administration. One such regulation defines the "Safe Harbor for Relieving the Poor and Distressed:"

.01 An organization will be considered charitable as described in § 501(c)(3) if it satisfies the following requirements:

(1) The organization establishes that for each project (a) at least 75 percent of the units are occupied by residents that qualify as low income; and (b) either at least 20 percent of the units are occupied by residents that also meet the very low-income limit for the area or 40 percent of the units are occupied by residents that also do not exceed 120 percent of the area's very low-income limit. Up to 25 percent of the units may be provided at market rates to

---

7. This is necessarily an inexact inquiry because the court finds no language in the Consent Decree which *prevents* CHC from moving away from deep gap funding. In fact, the Consent Decree requires that the "Defendants shall provide funds for, and/or financing of, *all costs associated* with the development and implementation of the housing program." *Consent Decree,* Exh. B at 18 Part B.1 (emphasis added). This

language would presumably include primary loans in addition to the now-disputed deep gap funding. Plaintiffs' Counsel counters that the income bands necessarily restrict CHC to deep gap funding. (R.T. at 174); *see also Consent Decree,* Exh. B at Part D.1 (requiring Federal and State Defendants to fund the gap between the cost of creation of housing and conventional financing).

persons who have incomes in excess of the low-income limit.

Rev. Proc. 96–32 § 3, 1996–20 I.R.B. 14 § 3.

This regulation is significant in two respects. First, it is possible that CHC could comply with existing Consent Decree income bands, and yet *violate* the IRS regulation by providing less than 75% of its units to residents who earn less than 80% of the median income.[8] The regulation also demonstrates that, even if the Consent Decree income bands are no longer requirements, structural protections remain which will force CHC to address the needs of low and very low income residents.[9] Notably, the Consent Decree income bands permit a greater proportion of "moderate income" tenants than is allowed under the IRS "safe haven" requirements. Rev. Proc. 96–32 § 3.01. Therefore, in some respects the IRS requirements provide more protection for the low and very low income resident than found in the Consent Decree.

Experience has also shown that strict enforcement of the income bands has proven "unworkable," *Rufo*, 502 U.S. at 384, 112 S.Ct. at 760. Market rents have dropped below the rents which would be permitted for moderate-income tenants. (Def.'s Mem. P. & A. at 10.) There is a shortage of moderate income tenants who wish to live in CHC developments, and CHC is prevented by the Consent Decree income bands from reclassifying these units for lower-income tenants. *Id.* CHC's Business Plan states "[p]rojects

have been experiencing vacancies which have been increasing and now total 37% of the units. The vacancy of these units is directly related to the affordability requirements set forth in Exhibit B of the Consent Decree." (Pls.' Exh. 24; *CHC Business Plan* at 55.) As one Board member argued during the February 13th hearing, "[the vacancy rate exists] because of the rigidity of the past programs.... The problem is these units have been designated for moderate income, and moderate income people don't want to live in these units." (R.T. at 72:2–9.)

Another problem with the income bands is the phenomenon of "income creep." Income creep is "the change in income of the actual tenants when their income is recertified a year later—[which] could put them in a different income band, and so your distribution by income bands has changed." (R.T. at 18:6–10.) IRS regulations anticipate this very problem:

> An organization originally meeting the safe harbor will *continue to satisfy* the requirements of the safe harbor if a resident's income increases and causes the organization to fail the safe harbor, provided that the resident's income does not exceed 140% of the applicable income limit under the safe harbor. If the resident's income exceeds 140% of the qualifying income limit, the organization will not fail to meet the safe harbor if it rents the next comparable

---

**8.** The distributions required in the consent decree are as follows:

> A. At least 25% of all units at 80%–120% of adjusted county median income (Moderate Income)
> B. At least 25% of all units at 50%–80% of adjusted county median income (Low Income)
> C. At least 25% of all units at 25%–50% of adjusted county median income (Very Low Income)
> D. At least 5% of all units at 0%–25% of adjusted county median income (Very Very Low Income)
> E. The remaining 20% of a project's units can be market rate, distributed among the four income bands above, or concentrated within one or more of the income bands.

*Consent Decree, Exhibit B* at 20–21.

CHC could satisfy both the IRS and Consent Decree requirements by limiting subsection A residents to no more than 80% of median in-

come. The Consent Decree, however, anticipates that this segment of the residents could be up to 120% of median income. *See* subsection A above.

**9.** The IRS regulations fail to provide one important structural protection: requirements for the very very low income resident, who earns 0–25 % of median county income. The Consent Decree currently requires that the Housing Program devote 5% of its units to such residents, yet the IRS safe haven does not include the very very poor. *See* Rev. Proc. 96–32 § 3.01.

In modifying the Consent Decree to make the income bands goals instead of strict requirements, it is not this court's intent to abandon the very real needs of very very low income residents. The court fully anticipates that CHC will strive to continue to meet and, if possible, exceed the five percent goal for very very low income residents.

non-qualifying unit to someone under the income limits.

Rev. Proc. 96–32 § 3.02(3) (emphasis added). The Consent Decree, however, has no provision to accommodate the problem of income creep. Enforcing the income bands as strict requirements could therefore require CHC to evict tenants from a unit as income creep skews the mandated distributions. Such a result is contrary both to the intent of the Consent Decree and to the public interest.

Changes in the nature of the administrating agency, the constraints of IRS regulations, and experience with the Housing Program support CHC's proposed modification changing the income bands from strict requirements to goals. Moreover, the proposed modification is tailored to the changed circumstances: CHC does not propose abandoning the income bands, but rather recognizes that the public interest is best served if the income bands are treated as goals, not as rigid requirements.

#### 4. *Rental Affordability Mechanism*

■ CHC seeks to revise Exhibit B of the Consent Decree to update the rental affordability mechanisms. The Lopez/Montoya Report explained that the current standard among affordable housing programs is rent based on "30% of adjusted county median income for rental units for the designated income band." (*Lopez/Montoya Report* at 5 ¶ 4.) The Old and Restructured Housing Programs based rents on a tenant's actual income. *Id.* at 6. This old system of evaluating rental amounts is not workable now that reliable income subsidies, such as the Section Eight program, are no longer readily available. (*Id.; see also* Def.'s Exh. A; McWhirk Decl. at 7 ¶ 17 ("The original floor rent concept is totally unworkable in the modern world of affordable housing finance without massive subsidy....."))

Similarly, it is necessary to update ownership affordability requirements to "reflect industry benchmarks applicable when the loan is originated." (*Lopez/Montoya Report* at 6–7.) By incorporating these industry benchmarks, current Century owners seeking to refinance and owners involved in Fannie Mae's rent-to-own program will have greater access to industry conforming financial products. *Id.* at 7.

#### 5. *Building Standards and Specifications*

■ The Lopez/Montoya Report explained that building standards controlling housing constructed or acquired under Exhibit B should conform to "the Uniform Building Code as well as all local building and zoning codes." (*Lopez/Montoya Report* at 7 ¶ 6.) As explained during the February 13th hearing, California's local and state codes—especially in light of seismic activity—quickly go out of conformity with federal HUD standards. (R.T. at 32:7–11.) For example, federal standards in the Consent Decree—last updated in 1988—are now out of conformity with local building codes. *Id.* The significant changes in local business codes—and the failure of the federal standards to keep pace—warrant CHC's proposed modification.

#### 6. *Enforcement of Use Restrictions*

■ Housing Program developments sold by CHC carry use restrictions, imposed to protect affordability. Experience with the currently utilized use restrictions has revealed that lenders and title companies often overlook the restrictions, resulting in expensive litigation for CHC. (R.T. at 33:3–20; *see also Lopez/ Montoya Report* at 8 ¶ 7.) The proposed modification reasonably permits CHC to revise use restrictions to protect the long-term affordability of its housing, and improve enforcement during sale and resale of units. (Def.'s Proposed Order at 5 ¶ IX.)

#### 7. *Loan Loss Reserve*

■ The loan loss reserve established with the California Housing Loan Insurance Fund was originally sized at $15.3 million. (Def.'s Proposed Order at 6 ¶ X.) As the Lopez/Montoya Report explained, "[t]he Reserve is Century's only insurance, other than its existing uncommitted funds, against real estate risk." (Def.'s Exh. A; *Lopez/Montoya Report* at 8 ¶ 8.) Accordingly, the Lopez/Montoya Report recommended the loan loss reserve remain funded at $15.3 million, and be "increased by an additional amount as

determined by an actuarial loss analysis to protect against loss under the Old Program." *Id.* As explained at the February 13th hearing, the modification allowing expansion of the loan loss reserves preserves long term affordability of the units by giving CHC the resources necessary to intervene and save a project when the project cannot pay its mortgage. (R.T. at 34:16–25.)

### 8. *Funding Eligibility*

■ CHC has proposed modifications of the Consent Decree which would enable the Board to acquire and rehabilitate existing housing, and to fund mixed-use projects. Kenneth Reed explained that "[c]ompared to the cost of constructing new housing units, the rehabilitation of existing housing may be a much less costly alternative of meeting the need to supply and preserve safe, decent and sanitary affordable housing." (Def.'s Exh. F; Reed Aff. at 4 ¶ 14.) There currently exists a large inventory of housing requiring rehabilitation in the area now served by CHC. *Id.* There are also "current opportunities to buy developments at substantial discounts from the Federal Housing Administration (FHA), Office of Thrift Supervision (OTS) and others, and to convert them to affordable rents." (Def.'s Exh. A; McWhirk Decl. at 8 ¶ 19.)

Mixed-use projects can also generate income which can support affordable housing, and can stabilize affordable housing in a marginal or redeveloping neighborhood. *Id.* As Jennifer Bigelow stated in her declaration in opposition to CHC's motion, "affordable housing development and economic development activities can complement each other in working to create a healthy economy and neighborhoods ..." (Bigelow Decl. at 19 ¶ 58.)

Bigelow continued to question the expertise of CHC's Board members in economic development and the wisdom of undertaking such projects. *Id.* CHC, however, has not stated that it plans to make mixed-use development the focus of its mission. In fact, the modification to Exhibit B only mentions mixed-use funding in the context of affordable housing. (Def.'s Proposed Order at 6 Part XI.)

New development opportunities available to CHC's Board merit modifying the funding eligibility requirements of CHC.

### B. *CHC's Proposed Modifications to Exhibit C*

■ CHC's proposed modifications to Exhibit C are less extensive than those proposed for Exhibit B. These modifications delete references to Caltrans throughout Exhibit C. This change is logical in light of the fact that the Privatization Order transferred all Housing Program assets and responsibilities to CHC. *See Order of July 12, 1996 Admitting CHC as Def. to Consent Decree* at 2–3 (discussing transfer of housing program assets and CHC's assumption of assets and obligations).

Another proposed modification to Exhibit C recognizes that certain previously existing support organizations—such as CFAAC—have been included into CHC's Division of Equal Opportunity Compliance (EOC). This new structure permits the enforcement of the Exhibit C goals, even though the prior state-sponsored support agencies have been released from their Consent Decree obligations. *See, e.g., Order of Aug. 14, 1996 Releasing CFAAC from Obligations under Consent* Decree at 3. The EOC opened on July 1, 1996, and actively monitors project compliance with Exhibit C goals. (Def.'s Exh. P; Anoai Decl. at 2.) The EOC reports monthly to CHC Board—more frequently than the previous support agencies reported. *Id.* at 3 ¶ 5.

CHC's proposed modifications to Exhibit C reflect the significant changes that have occurred in the nature of the Housing Program's administrating agency. These modifications also perpetuate the Exhibit C goals formerly enforced by the state-sponsored support agencies. Notably, the proposed modifications do not alter the goals currently found in Exhibit C, *compare Def.'s Proposed Exh. C* at 7–14 *with Consent Decree, Exh. C* at 4–23, and are therefore tailored to accommodate the new administrative structure.

### III. *Plaintiffs' Counsel has not Met its Initial Burden of Demonstrating Significant Change of Fact Warranting Modification*

■ Plaintiffs' Counsel has failed to meet its initial burden to identify significant

changes of fact which support its proposed modifications. Plaintiffs' Counsel states that its proposed modifications to Exhibits B and C "essentially restate, update, and clarify changes to the Consent Decree that are necessary to update those Exhibits to reflect the structural changes arising from transferring the administration of the housing program from the State (HCD/CFHP) to a nonprofit entity." (Pls.' Mem. P. & A. Supp. Not. Amend Consent Decree at 9.) These largely typographical changes fail to reflect the Privatization's Order's understanding that the Consent Decree—designed around state administration of the Housing Program—would not easily accommodate CHC. As discussed in more depth above, the Privatization Order anticipated that the parties would:

> [R]eview the Consent Decree, Court orders thereunder, and state and federal laws to determine what modifications may be desirable for the Corporation to achieve Exhibit B and C goals in an efficient and equitable manner, and to recommend how Housing Program procedures and functions should be revised to reflect privatization of the Housing Program.

*Privatization Order* at 17 Part 2.1.2. Counsel's proposed restatements of Exhibits B and C do not address the new challenges posed by privatization of the Housing Program. Rather, the proposed modifications effectively seek to preserve the constraints formerly binding *state* administration of the Housing Program.

■ Counsel's proposed Exhibit D, establishing a Corridor Ombudsman, is similarly problematic. Plaintiffs' Counsel characterizes this proposed modification as replacing "various former procedural monitoring safeguards (CFAAC and the Corridor Advocate) with a less expensive and streamlined single independent monitoring entity (the Ombudsman)." (Pl.'s Mem. P. & A. Supp. Mot. Amend Consent Decree at 10.) This court made it clear in an April 25, 1996 hearing that the support agencies were to be incorporated into CHC, and that CHC was to ensure that the support agencies' missions be continued. Therefore "less expensive and streamlined" monitoring entities now exist: CHC's Divisions of EOC and Resident Services.

Plaintiffs' Counsel has failed to identify changed circumstances which merit this court reversing its prior orders, abandoning the newly-created mechanisms, and adding an entirely new layer of bureaucracy by creating an Ombudsman contemplated in neither the Consent Decree nor the Privatization Order.

The court has carefully considered the exhibits, declarations, and affidavits regarding proposed modifications to Exhibits B and C and the proposed Exhibit D of the Consent Decree. Each Party has had ample opportunity to "air its objections," *Oregon*, 913 F.2d at 582, and the court has heard and considered extensive argument, augmented by supplemental briefing. Upon consideration of this information and of these arguments;

IT IS HEREBY ORDERED that the pre-existing Exhibits B and C to the Final Amended Consent Decree in this case are hereby removed and replaced with the modified Exhibits B and C, respectively, proffered by Defendant Century Housing Corporation and attached hereto.

### ATTACHMENT

#### 1. *EXHIBIT B*

Exhibit B of the Final Amended Consent Decree, and all orders of this Court subsequent thereto to the extent they conflict herewith, are hereby revoked and replaced by Amended Exhibit B as follows:

#### *AMENDED EXHIBIT B*

#### DEVELOPMENT AND IMPLEMENTATION OF HOUSING PLAN

#### I. *INTRODUCTION*

This Exhibit sets forth provisions for implementation of the housing plan by the Century Housing Corporation ("Century") in order to create affordable housing opportunities for eligible persons and households in the area served.

After careful consideration and study of the housing needs of the area and programs available to Century, needs of residents currently residing in Century-owned and operated developments, and future opportunities

for Century to address affordable housing needs, Century shall:

A. Finance, refinance, or enhance production of affordable housing through new construction or acquisition/rehabilitation of existing units, and sale of loans into secondary markets;

B. Make units produced available to eligible purchasers or renters in accordance with this Exhibit;

C. Continue to sell or operate currently owned single-family and multifamily properties to individual home buyers and operators of rental housing, ensuring that the affordability guidelines outlined herein are enforced through diligent monitoring and enforcement efforts;

D. Maximize the use of its resources by working in partnership with public agencies and private sources of funds, leveraging its resources while ensuring that the greatest number of affordable housing units are provided and local housing needs are addressed;

E. Continue to seek innovative ways to recycle and recapture funds through the sale of existing loans; and

F. Provide technical assistance in conjunction with any such activities.

## II. *IMPLEMENTATION*

Exhibit B shall be implemented by Century in a manner consistent with the July 31, 1995 order of the U.S. District Court ("Privatization Order") and the balance of the Consent Decree including Amended Exhibit C thereto, as long as such Court retains jurisdiction over the Consent Decree and the underlying litigation in *Keith v. Volpe* (U.S. District Court, Central District of California, Civil No. 72–355–HP). Policy for Century's implementation of the housing program as contemplated in this Amended Exhibit B shall be determined by Century's Board of Directors and administered by Century's President/CEO and staff.

The following general parameters and minimum standards shall be followed by Century in addressing its existing development, financing, monitoring and compliance obligations and in implementation of new housing programs. Nothing herein shall preclude the Board from interpreting the parameters and standards in a manner otherwise consistent with this Amended Exhibit B and Amended Exhibit C in order to address future development, monitoring and compliance obligations and changing needs in the affordable housing market. The Court recognizes that over time, Century may develop more comprehensive and creative methods of addressing its development, financing, monitoring and compliance obligations, and implementing new housing programs which better address affordable housing needs.

## III. *AREA SERVED*

Century may take any action relative to the production of affordable housing located in the Los Angeles metropolitan area, including, but not limited to, Los Angeles and Orange Counties, as determined by Century's Board of Directors.

## IV. *UNDERWRITING CRITERIA*

Century shall use underwriting criteria in implementing its affordable housing activities hereunder in a manner consistent with other affordable housing sponsors and lenders, secondary markets and government programs and agencies used in partnership with Century.

Century is not required to use other lenders' criteria and may apply its own underwriting criteria for various product lines and developments. Century may use other lenders' affordability requirements to establish affordability, but may independently apply its own underwriting criteria as well in order to provide for economic viability of housing financed or assisted and long-term affordability of such housing.

## V. *DISTRIBUTION OF UNITS BY INCOME BAND*

In order to allow maximum flexibility in implementation hereunder, Century's goal for distribution of units produced, by income band, shall be:

At least 25% of all units at 80%–120% of adjusted county median income (Moderate Income)

At least 25% of all units at 50%–80% of adjusted county median income (Low Income);

At least 25% of all units at 25%–50% of adjusted county median income (Very Low Income);

At least 5% of all units at 0%–25% of adjusted county median income (Very Very Low Income);

The remaining 20% of a project's units can be market rate, distributed among the four income bands above, or concentrated within in one or more of the income bands.

## VI. AFFORDABILITY REQUIREMENTS FOR RENTAL UNITS

Affordability based on 30% of adjusted county median income for rental units for the designated income level shall be used in determining affordability for households occupying rental units. This standard shall be applied to those units currently vacant and all Old and Restructured Program units. Consideration shall be given to phasing in over a three-year period any necessary rent increases which may occur due to the implementation of this standard; the Board may give additional consideration to hardship cases.

The use of Section 8 certificate type rental assistance shall be allowed for existing units as well as projects being developed, regardless of the rent structure of a rental development, provided that for underwriting purposes, Section 8 subsidies shall be excluded from evaluation of a development's projected cash flow.

## VII. OWNERSHIP AFFORDABILITY REQUIREMENTS

For ownership units, a unit will be considered affordable to one of the four designated income levels when the purchaser's monthly outlay for housing does not exceed 33% of gross income and when combined with other long-term purchaser debt the total monthly outlay does not exceed 38–% of gross income, or as calculated in a manner consistent with

industry benchmarks as may be adjusted from time to time and approved by Board.

Century may utilize the industry-standard 33% of gross income front-end ratio to determine affordability, and incorporate the current 38% back-end ratio into underwriting criteria without regard to affordability, taking industry-standard compensating factors into account.

## VIII. BUILDING STANDARDS AND SPECIFICATIONS

All affordable housing developed or financed in conjunction with Century funds shall comply with the Uniform Building Code as well as all local building and zoning codes as may be applicable, and as may be augmented periodically by the Board to reflect industry standards and the need to provide decent, safe, and sanitary housing.

## IX. ENFORCEMENT OF USE RESTRICTIONS

Century shall make every effort to protect long-term affordability of its housing as well as its financial investment therein. Loan documentation which accomplishes this objective shall be used for both ownership and rental housing. Century shall take whatever steps are necessary to this end, including revision of current loan documentation where possible to improve enforcement as sale and resale of units occur, as well as purchase of existing first loans in order to improve enforcement. Such loan documentation shall provide for adequate security of any promissory note which allows Century to maximize its net return in the event of default and foreclosure. Century shall determine enforcement and protection of affordability on a case-by-case basis, evaluating overall cost-effectiveness and prudent use of Century's resources.

## X. LOAN LOSS RESERVE

The loan loss reserve established with the California Housing Loan Insurance Fund was originally sized at $15.3 million based on an actuarial analysis of anticipated losses. Century shall fully fund the loan loss reserve in the amount of $15.3 million to protect against loss on Restructured Program prop-

erties, and increased or decreased by an amount determined by an updated actuarial loss analysis of the California Housing Loan Insurance Fund to protect against aggregate loss on loans and properties under the Old and Restructured Programs, only after recommendation by the President/CEO to the Board of Directors.

## XI. *FUNDING ELIGIBILITY*

Century may fund acquisition and/or rehabilitation of existing housing, in addition to new construction of permanent affordable housing, in order to give the Board flexibility to participate freely in rehabilitation and mixed-use developments, subject to adherence to Century's Business Plan and IRS standards for nonprofit corporations.

## XII. *EFFECT OF THIS EXHIBIT AND ORDER*

This Exhibit and Order shall supersede and replace all previous exhibits and orders pertaining to matters within the purview hereof. It shall constitute the sole obligation and responsibility of Century with regard to such matters.

### 2. *EXHIBIT C*

Exhibit C of the Final Amended Consent Decree, and all orders of this Court subsequent thereto to the extent they conflict herewith, are hereby revoked and replaced by Amended Exhibit C as follows:

#### *AMENDED EXHIBIT C*

#### AMENDED EMPLOYMENT ACTION PLAN AND ORDER FOR RESIDENT SERVICES

## I. *INTRODUCTION*

This Exhibit sets forth an employment and business plan of affirmative action for the benefit of the corridor communities, and other communities, women, and minority group members. This plan shall apply to projects funded by the Century Housing Corporation ("Century") under the Restructured Program. References following some provisions herein are from Chapter 2.5, §§ 2050–2057,

of the Public Contracts Code of the State of California.

The provisions of this plan represent obligations distinct from those that are set forth in state and federal law.

As used in this Exhibit, "Minority" means a person as defined in § 2051(c) of the California Public Contracts Code and members of other groups, or other individuals, found to be economically and socially disadvantaged by the Small Business Administration under Section 8(a) of the Small Business Act, as amended (15 U.S.C. § 637(a)).

## II. *PROJECT DOCUMENTS*

All Requests for Proposal, Development Agreements with Affirmative Action Plans and Bid Specification Documents prepared in projects shall include the following elements among the enumerated responsiveness criteria:

### A. *Minority/Women's Business Enterprise ("M/WBE") Goals*

1. A "Minority or Women's Business Enterprise" ("M/WBE") means a small business concern, as defined pursuant to Section 3 of the Small Business Act and implementing regulations, which is owned and controlled by one or more minorities or women, and as defined in § 2051(d) of the California Public Contracts Code.

2. The goals for the dollar value of work to be awarded to M/WBEs for each project shall be as follows:

| | |
|---|---|
| Overall | 47% |
| MBE | 37%–42% |
| WBE | 5%–10% |

3. Affirmative action techniques shall be undertaken by Century to facilitate MBE participation in contracting activities. These techniques include:

a. Providing assistance to M/WBEs in overcoming barriers such as inability to obtain bonding, financing and technical assistance;

b. Carrying out information and communication programs on contracting procedures and specific contracting opportunities in a timely manner, with

such programs being bilingual where appropriate.

4. Century shall continue to thoroughly investigate the full extent of services offered by financial institutions owned and controlled by minorities or women in their community and determine the most feasible area in which to utilize the services of these banks. Developers/prime contractors shall also be encouraged to utilize the services of financial institutions owned and controlled by minorities or women.

5. Century shall make available to developers and bidders a directory or source list to facilitate identifying M/WBEs with capabilities relevant to general contracting requirements and to particular solicitations, specifying which firms are certified pursuant to § 2053 of the California Public Contracts Code, or which firms the Small Business Administration has determined to be eligible M/WBES in accordance with procedures set forth herein and at 45 Fed. Reg. 21185, subpart c.

6. Procedures to require that participating M/WBEs are identified by name by competitors for contracts are as follows: Century shall indicate, in Requests for Proposals, goals for the use of firms owned and controlled by minorities and firms owned and controlled by women. Solicitations shall require all developers and contractors to submit a written assurance of meeting the goals in their bids or proposals. Each project shall be pursued pursuant to a Development Agreement with appropriate attachments, which shall contain an Affirmative Action Plan which shall specify the manner in which the goals will be met and the names of the M/WBE subcontractors and suppliers, a description of the work each is to perform, and the dollar value of each proposed M/WBE subcontract. Agreements between a bidder/proposer and an M/WBE in which the M/WBE promises not to provide contracting quotations to other bidders/proposers are prohibited.

7. M/WBE participation shall be counted toward meeting MBE goals set in accordance with this Plan as follows:

a. Once a firm is determined to be an eligible M/WBE in accordance with this subpart, the total dollar value of the contract awarded to the M/WBE is counted toward the applicable M/WBE goals.

b. The total dollar value of a contract to an MBE owned and controlled by both minority males and non-minority females is counted toward the goals for minorities and women respectively, in proportion to the percentage of ownership and control of each group in the business. The total dollar value of a contract with an MBE owned and controlled by minority women is counted toward either the minority goal or the goal for women, but not to both. The contractor employing the firm, or Century may choose the goal to which the contract value is applied.

c. A contractor may count toward its M/WBE goals a portion of the total dollar value of a contract with a joint venture eligible under the standards of this subpart equal to the percentage of the ownership and controls of the M/WBE partner in the joint venture.

d. (i) Century or a contractor may count toward its M/WBE goals only expenditures to M/WBEs that perform a commercially useful function in the work of a contract. An M/WBE is considered to perform a commercially useful function when it is responsible for execution of a distinct element of the work of a contract and carrying out its responsibilities by actually performing, managing, and supervising the work involved. To determine whether an M/WBE is performing a commercially useful function, Century or the contractor shall evaluate the amount of the work subcontracted, industry practices, and other relevant factors.

(ii) Consistent with normal industry practices, an M/WBE may enter into subcontracts. If an M/WBE contractor subcontracts a significantly greater portion of the work of the contract than would be expected on the basis of normal industry practices, the M/WBE shall

be presumed not to be performing a commercially useful function. The M/WBE may present evidence to rebut this presumption to Century.

e. All verifiable non-trade costs (land costs, permit fees, financing costs, interest charges, operating reserves and taxes), and all other costs that Century determines cannot be utilized or counted toward goal attainment, shall be automatically deducted from the cost basis of all housing projects for the purpose of determining whether the goals are achieved. In addition, developer fees and packager fees paid to certified M/WBEs shall be counted toward the M/WBE goals.

f. Community-based non-profit corporations which act as either developers or packagers shall receive a deduction of developer and/or packager fees from the cost basis of their projects in addition to the other "non-trade" costs to be deducted which are listed in Recommendation B. For the purpose of this paragraph, a community based non-profit shall be defined as: (a) a 501(c)(3) or 501(c)(4) corporation with a majority of its board presently composed of women, minorities, or a combination of the two, and (b) located or operating within the tertiary zone (18 miles from the Century Freeway (I–105) in any direction). Century shall make the final determination as to the qualifications of a community-based non-profit corporation. This provision may be waived on individual contracts upon the decision of Century's President/CEO.

8. Selection criteria to ensure that Development Agreements are executed with project sponsors that meet M/WBE goals include the following:

a. To demonstrate sufficient reasonable efforts to meet the M/WBE contract goal, a developer or a contractor shall document the steps it has taken to obtain M/WBE participation, including but not limited to the following:

(i) Advertisement in general circulation media, trade association publica-

tions, and minority-focus media, for at least 20 days before bids or proposals are due. If 20 days are not available, publication for a shorter reasonable time is acceptable;

(ii) Written notification to M/WBEs that their interest in the contract is solicited;

(iii) Efforts made to select portions of the work proposed to be performed by M/WBEs in order to increase the likelihood of achieving the stated goal;

(iv) Efforts made to negotiate with M/WBEs for specific subbids including at a minimum:

(a) The names, addresses, and telephone numbers of M/WBEs that were contacted;

(b) A description of the information provided to M/WBEs regarding the plans and specifications for portions of the work to be performed;

(c) A statement of why additional agreements with M/WBEs were not reached;

(v) Efforts made to assist the M/WBEs contacted that need assistance in obtaining bonding or insurance required;

(vi) Concerning each M/WBE contacted but rejected as unqualified, the contractors' reasons for its conclusions.

b. To ensure that all obligations under contracts awarded to M/WBEs are met, Century shall review the Developer's or contractor's M/WBE involvement efforts during the performance of the contract. The contractor or developer shall bring to Century's attention any situation in which regularly scheduled progress payments are not made to M/WBE subcontractors.

Documentation of a.(i) through a. (vi) shall be provided in the Development Agreement and its Affirmative Action Plan.

9. Century shall require developers and/or contractors to make good faith efforts to replace an M/WBE subcontractor that is unable to perform successfully with another M/WBE. Century shall approve

all substitutions of subcontractors during contract performance, in order to ensure that the substitute firms are eligible M/WBEs. Century's President/CEO is to be advised of all such substitution requests and if the President/CEO disagrees, the substitution shall be rejected.

10. The Developer/contractor shall designate, and make known to Century, a liaison officer to administer the Developer/contractor's minority business enterprise and equal employment opportunities program.

11. In order to monitor the progress of its M/WBE program, Century shall develop a record keeping system which will identify and *assess* M/WBE contract awards, prime contractors' and developers' progress in achieving M/WBE subcontract goals, and other M/WBE affirmative action efforts.

Specifically, Century shall maintain records showing:

a. Procedures which have been adopted to comply with the requirements of this plan;

b. Awards to M/WBE. These awards shall be measured against projected M/WBE awards and/or M/WBE goals. To assist in this effort, Century shall obtain regular reports from prime contractors or developers on their progress in meeting contractual M/WBEs obligations;

c. Specific efforts to identify and award contracts to M/WBEs;

d. Reports:

(i) M/WBE reports shall be submitted quarterly to Century's President/CEO who shall in turn forward them to the Board of Directors and Court.

(ii) These reports shall include a minimum:

(a) The number of contracts awarded to M/WBEs;

(b) A description of the general categories of contracts awarded to M/WBEs;

(c) The dollar value of contracts awarded to M/WBEs;

(d) The percentage of the dollar value of all contracts awarded during this period which were awarded to M/WBEs; and

(e) An indication of whether and the extent to which the percentage met or exceeded the goal specified in the application.

e. In order to enable Century to meet the obligations of this Section, the Century Freeway Affirmative Action Committee shall deliver to Century operating copies of its data base and monitoring software.

B. *Equal Employment Opportunity Goals*

1. The goals for minority and female participation, expressed in percentage terms for the developer's/contractor's aggregate work force for each trade on all construction work on projects covered by this Exhibit shall be as follows:

a. Minority Participation: Labor: 65% per trade;

b. Female Participation: Labor: 10% per trade.

2. The goals for minority and female participation expressed in percentage terms for the contractor's management jobs at the corporate level whether or not related to the projects covered by this Decree, shall be as follows:

a. Minority Management-level jobs: 5%–10%;

b. Female Management-level jobs: 5%–10%.

3. At least one-fourth of the women and minority group members employed in apprenticeship and training programs shall be people hired for the first time for work on a housing project financed by Century.

4. The developer or contractor shall exercise "best efforts" to meet the goals set forth in this subsection by locating and employing minority group members and females who regularly reside in the corridor communities. All efforts to comply with this provision shall be fully documented.

5. The developer's or contractor's responsiveness and compliance with these requirements shall be based on its plan for and its actual implementation of specific affirmative action obligations as spelled out in the Development Agreement and attachments thereto, together with its Affirmative Action Plan and its efforts to meet the goals established herein. "Best efforts" to meet these goals shall include, but not be limited to, concrete and meaningful efforts to achieve, publicize or advertise job availability and the contractor's or developer's EEO policy through the news media, specifically including minority and female news media, and to make serious and meaningful use of Century's services.

6. A bidder's or proposer's failure to establish a comprehensive affirmative action plan designed to meet these goals effectively will be grounds for finding the bid or proposal nonresponsive.

### C. *Regional Business and Employment Goals*

1. In addition to its commitment to utilize minority subcontractors and to hire minority and female employees, each developer or contractor shall, in carrying out work pursuant to this Amended Exhibit C, make best efforts to find and utilize qualified contractors and persons who regularly reside or have their principal place of business in the community where the project is situated, except:

a. To the extent that qualified persons regularly residing in the area are not available;

b. For the reasonable needs of the contractor or his subcontractors to employ supervisory or specially experienced individuals necessary to assure execution of the contract;

c. For the obligation of the contractor or his subcontractors to offer employment to present or former employees as the result of a lawful collective bargaining contract, provided that in no event shall the number of nonresident persons employed under this subsection exceed 20% of the total number of employees employed by such contractor and his subcontractors on such project; and

d. To the extent that this provision may conflict with the minority business and employment goals, those goals take precedence.

### D. *Appeal of Decisions*

Decisions made by Century under authority of this Amended Exhibit C shall be appealed to the President/CEO, or to the Board or a committee of the Board as may be established by the Board.

### III. *THE DIVISION OF EQUAL OPPORTUNITY COMPLIANCE*

A. Century shall establish a Division of Equal Opportunity Compliance and appoint an administrative officer reporting directly to the President/CEO who shall be responsible for:

1. Reviewing and preparing written comments on the responsiveness of all proposals and contracts. The final decision as to whether a bid is fully responsive rests with such administrative officer.

2. Conducting periodic reviews of each developer's or contractor's performance, receiving complaints, and conducting regular on-site inspections and interviews. The final decision to impose legal sanctions or declaration that the contractor is ineligible for further government contracts, rests with Century's President/CEO.

3. Aggressively assisting in the process of achieving equal employment of minority/women business participation, and regional employment and business, by helping to locate and recruit employees, contractors and subcontractors; and by establishing effective programs for contractors and subcontractors who are unable to meet M/WBE and Equal Employment Opportunity goals.

4. Reporting quarterly to Century's President/CEO on all matters covered in item number 11.(d) above. The President/CEO shall in turn forward such reports to the Court and Plaintiffs' Counsel so long as the Court retains jurisdiction.

B. The Century Freeway Affirmative Action Committee ("CFAAC") shall deliver to Century all monitoring data bases and software programs used in connection with Century Freeway construction and/or housing programs.

C. The Division of Equal Opportunity Compliance shall be responsible for performing the following services previously provided by the Women's Employment Program:

1. Support services to tradeswomen in the following areas:

a. Financial support for union fees, tools, and work boots.

b. Organize support groups, hold support group meetings, and organize supervised skill workshops.

c. Conduct weekly job search workshops.

d. Provide representation at work dispute meetings and hearings with contractors, unions or Joint Apprenticeship Training Committees.

e. Help in the preparation of resumes and send them to contractors.

f. Investigate and mediate work disputes including complaints of sexual harassment or discrimination.

g. Provide referral and job placement services.

h. Maintain a Tradeswomen Information database. The existing WEP shall provide Century with copies of its data base for this purpose.

2. Compliance monitoring through the following means:

a. Perform job site visits.

b. Monitor retention and movement of tradeswomen on Century-funded projects.

c. Conduct on-site EEO meetings.

d. Investigate complaints and facilitate resolutions.

e. Make recommendations for compliance or demonstration of "good faith."

3. Reporting

The administrative officer shall report quarterly to Century's President/CEO on all performance standards of this program. The President/CEO shall, in turn, forward these reports to the Court. For this purpose, the existing WEP will provide the Division with copies of its data base and monitoring software.

4. Staff

Century shall hire staff and retain consultants sufficient to accomplish these duties.

D. Services formerly performed by CFAAC, WEP or the Century Freeway Technical Management Service through Triaxial Management Services are the responsibility of the Division of Equal Opportunity Compliance.

IV. *DIVISION OF RESIDENT SERVICES*

A. Century shall establish a Division of Resident Services and appoint an administrative officer of such Division. The Division of Resident Services shall assume responsibility for all services formerly provided by the Office of the Advocate.

B. The administrative officer shall have direct access to each administrator of each of the operating and administrative divisions of Century to discuss the mediation of problems within the purview of this Amended Exhibit C.

C. The administrative officer shall have direct access to the President/CEO to present problems within the purview of this Amended Exhibit C in all instances that in the opinion of the administrative officer have not been resolved rationally by line administration. The administrative officer shall report through the President/CEO to the Board, the Court and Plaintiffs' Counsel as long as the Court retains jurisdiction.

D. The duties of the Division shall be to provide services to occupants of Century-funded housing units in the following areas:

1. Determination of benefits

2. Purchase of property

3. Property management

4. Maintenance and security measures

5. Recertification of income

6. Resale of property

E. The Division shall conduct an aggressive outreach program to acquaint occupants of Century-funded projects with its services and availability.

F. The administrative officer shall report quarterly to Century's President/CEO on performance of its duties and all performance standards of this Division. The President/CEO shall forward such reports to the Court.

G. Century shall hire such staff and retain such consultants as are required to fully implement these responsibilities.

## V. PRE-APPRENTICESHIP TRAINING PROGRAM

A. Century shall negotiate and contract with CETI for the Pre–Apprenticeship Training Program ("PATP"), subject to the conditions provided herein:

1. The contract amount for fiscal year 1996–97 shall not exceed $985,000.

2. CETI shall employ a women's outreach officer designated by Century who will perform the outreach and recruitment functions previously performed by the Women's Employment Program including:

a. Networking with community based organizations, schools, local and state government agencies and women's organizations.

b. Networking with homebuilders, the Job Corps, State Division of Apprenticeship Standards and unions.

c. Conducting "Construction Industry Orientation" workshops regularly and at outside locations.

d. Participating in job fairs and radio and television programs.

3. CETI shall cooperate with Century to develop new sources of funding for PATP.

4. CETI shall cooperate with Century in conducting a follow-up tracking study to determine the effectiveness of the PATP in developing long-term job skills and employment in the construction trades by its graduates.

5. CETI shall take appropriate action to add two (2) Century Directors to the CETI Board of Directors.

B. Century's President/CEO and CETI shall each report quarterly to the Court on all performance factors in this Program. They shall also report the outcome of any contract negotiations.

## VI. DEVELOPMENT AGREEMENT PROVISIONS

Development Agreements executed by Century with developers for the production of affordable housing under the Restructured Program shall contain substantially the following provisions:

### CENTURY MONITORING PLAN FOR AFFIRMATIVE ACTION PROVISIONS

### PUBLIC PRIVATE PARTNERSHIP

1. Goal Setting

MBE/WBE and Employment goals will be set as provided in § 307.1 and Attachment 9 of the Development Agreement.

2. Outreach

Century shall assist Developer, its general contractor, and any subcontractor with outreach activities and other forms of technical, management, and dispute resolution assistance designed to maximize participation of M/WBE and corridor firms. Failure of Century to provide such assistance, or failure of Century to provide adequate or competent assistance shall not relieve Developer of any of its obligations under the Development Agreement.

3. Certification

Pursuant to the Public Contracts Code of the State of California, Chapter 2, Part 1 of Division 2, Section 2050, through § 2057, certified M/WBEs and M/WBEs shall be counted toward the M/WBE goal. If the Developer wishes to obtain credit for MBE/WBE goal attainment purposes for the employment of a specific minorities or women entity as a contractor or subcontractor, it is the Developer's responsibility to ensure that the entity

is certified as an MBE or WBE, or that such entity applies timely for certification in accordance with the Developer's Action Plan as approved by Century before such entity is due to commence work on the Project. Absent bad faith and subject to the following paragraph, the Developer may rely on any document issued or published by Caltrans, and current as of the date of employment by the Developer of such entity, showing the entity to be a certified MBE or WBE.

Century will advocate and promote its best efforts to provide an expedited certification review process in accordance with the said order. In addition, Century will schedule outreach activities and conduct workshops if requested to assist contractors in obtaining certification.

4. Pre-Construction Conference

The Action Plan, and Developer's performance thereunder and under this Development Agreement may be relied upon by Century when determining whether construction may commence.

The Developer is responsible for ensuring that all subcontractors are adequately informed of their obligations under the Amended Exhibit C of the Consent Decree, and the provisions of this Development Agreement (including but not limited to Attachments 8 and 9 hereto) with which they are required to comply pursuant to § 307.1(a) hereof.

The process of payments to contractors shall be fully explained by the Developer. In addition, Century representatives shall review with the general contractor and all subcontractors the Century forms which need to be submitted (including but not limited to Monthly Employment Utilization Reports, Monthly M/WBE Utilization Reports, and General Contractor's Monthly List of Subcontractors), and the time-line for submission.

5. Monitoring

5.1 On-site Monitoring.

After the commencement of construction, Century may commence periodic on-site inspections for contract compliance. Century through its authorized representative shall report to the general contractor's on-site office and the general contractor's representative shall provide the Century representative with a listing of all subcontractors performing construction services that day, and a daily work force count. The individual subcontractors then present on site shall report to the Century representative their total work force for that day. The Century representative may randomly interview workers for corridor residency, ethnicity, and gender as well as inspect the project site for other details related to Amended Exhibit C compliance.

5.2 Documentary Monitoring.

During the construction period, the Developer shall submit monthly to Century the following forms and documents: Monthly Employment Utilization Reports, Monthly M/WBE Utilization Reports and General Contractor's Monthly List of Subcontractors. Century may inform the Developer and general contractor of any discrepancies and may require the Developer to meet with Century representatives in order to explain and resolve such discrepancies. In the event of any unresolved dispute, the matter shall be brought forth to private third party arbitration in accordance to Developer/general contractor and general contractor/subcontractor contracts.

Within 10 calendar days of the effective dates thereof, the Developer shall provide Century with copies of all accepted bids, subcontracts and other instruments entered into as part of the Developer's Action Plan. Such accepted bids, subcontracts and instruments shall be deemed to have become supplements to the Developer's Action Plan and Century shall take them into account in determining whether the Developer is in compliance therewith.

6. Records

Century shall have access to all Developer/general contractor/subcontractor records, including but not limited to payroll information and documentation or any other additional supporting documentation which Cen-

tury deems may be necessary for monitoring Developer's compliance with Amended Exhibit C of the Consent Decree.

7. Substitutions

The Developer shall give Century 72 hours written notice of its intent to terminate a contract with a certified M/WBE general contractor and of its general contractor's intent to terminate a subcontract with a certified M/WBE subcontractor. General contractors shall make good faith efforts to replace a certified M/WBE subcontractor that is unable to perform successfully with another certified M/WBE. Century shall ascertain the certification eligibility of the proposed M/WBE. Prior to the substitution and in the event of a contractual dispute between two affected parties, Century may facilitate a meeting between the disputants and the Developer in order to assist in resolution. After investigation and consideration of the circumstances surrounding the substitution, Century may make a determination as to whether the Developer's actions with regard to the substitution are consistent with the Developer's obligations to make good faith efforts to attain MBE/WBE contracting goals. If Century determines that the Developer's actions are not consistent with such good faith efforts, Century may issue a Notice of Deficiency pursuant to paragraph 8.1 of this Attachment 8.

8. Compliance Enforcement

8.1 In the event that Century determines at any time before or during construction of the project that Developer is not in compliance with its obligations under § 307.1, this Attachment 8 or Attachment 9 hereto, Century may issue a Notice of Deficiency to the Developer, with a copy to the President/CEO, stating the circumstances of Developer's non-compliance. Century may take into account any such Notice of Deficiency, together with the Developer's response (if any) thereto in determining whether or not Developer is in compliance with this Development Agreement and whether or not Developer has made good faith efforts to attain MBE/

WBE goals for the purposes of assessment of liquidated damages pursuant to § 307.1(e)(2). Failure of Century to issue a Notice of Deficiency under this paragraph shall not relieve Developer of its obligations hereunder nor constitute any waiver thereof.

8.2 Century's remedies for enforcement of M/WBE requirements of this Development Agreement shall be as provided in the Development Agreement itself, and include but are not limited to the imposition of damages pursuant to § 307.1(e)(2) of the Development Agreement. Other remedies allowed by state and federal law may be pursued by Century.

Developer:

By: _____

## VII. *EFFECT OF THIS EXHIBIT*

This Exhibit shall supersede and replace all previous exhibits and orders pertaining to Exhibit C and subjects within the purview of this document. It shall constitute the sole obligation and responsibility of Century with regard to such matters.